IRMA DICENZO, Plaintiff-Appellant, Cross-Appellee, and JESSE KAHIKINA, Plaintiff, *v.* HELEN M. IZAWA, Defendant-Appellee, Cross-Appellant, and EUGENE SHEINIUK, Defendant

NO. 10719

(CIV. NO. 74570)

JULY 18, 1986

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

530

OPINION OF THE COURT BY NAKAMURA, J.

The plaintiff in an action for damages stemming from an automobile accident appeals from a judgment of the Circuit Court of the First Circuit in favor of the defendant. We vacate the judgment and remand the case for a new trial because a review of the record discloses the commission of reversible error by the trial court. In our opinion the court erred in ruling that a statement given by the defendant to a representative of her insurer was not subject to discovery and in instruct-

ing the jury on an "emergency situation" purportedly confronted by the defendant.[1]

## I.

The accident leading to the suit occurred on April 12, 1982 on Kalanianaole Highway when a car being driven toward Waimanalo by the plaintiff, Irma DiCenzo, collided with one being driven in the opposite direction by the defendant, Helen Izawa. The collision took place after Ms. Izawa's car jumped the four-lane divided highway's grass medial strip and barged into the Waimanalo-bound traffic lanes. Other than the foregoing, the dispositive facts were disputed at trial.

Ms. Izawa attributed the erratic movement of her vehicle to the sudden, unexpected appearance of another car in the lane of traffic in which she was travelling. A blue station wagon, she claimed, suddenly swerved in and out of her lane. When the station wagon cut in front of her again, she "just had to turn left to avoid [a] collision." She recalled that when she "applied the brakes [she] lossed [sic] control because [her car] started to skid." Her further recollection, though hazy, was that she saw a car, presumably the plaintiff's, approaching from the opposite direction as she braked, but "at that point, [her] car started to skid across the medial strip." She professed scant memory of what happened thereafter because "it was happening so quickly" and she "panicked" when "the car started to skid." Evidence given by others established that the car went over the medial strip, struck Mrs. DiCenzo's blue Datsun, crossed two traffic lanes, crashed into a metal guardrail, and turned over. Mrs. DiCenzo suffered extensive injuries as a consequence of the two-car collision in which her two-door sedan was hit on the driver's side.

Mrs. DiCenzo testified that she had driven her daughters to school in Kailua and was on the way home to Waimanalo with her mother when the mishap occurred. She said she first saw the white car that subsequently struck her car on the other side of the highway as she started to drive up a slight incline in the road near the Maunawili Elementary School. She noticed the vehicle as she "look[ed] at a flow of traffic

---

[1]In view of our conclusion that reversible error was committed in these respects, we do not discuss the remaining eight points of error raised by plaintiff-appellant.

coming down that incline" and saw it "swerving in its own lane." "Then," she said, "the white vehicle accelerated across the medial strip and struck us." Mrs. DiCenzo was positive "that there wasn't a car that cut off [the white] car" as claimed by Ms. Izawa. And "[w]hen [Mrs. DiCenzo] saw the [white] car moving in its own lane, just before it left [the lane], she threw [her] car in neutral, hit the brakes [at the] same time, and . . . told [her mother], 'Mom, we're going to get hit.'" She "knew" they would be hit "[b]ecause of the direction the car was coming [from] and because there was a car next to [her] that [she] couldn't change lane[s] to avoid it."

At the close of evidence, the trial judge directed a verdict in the plaintiff's favor on the issue of whether her negligence was a causative factor in the accident. Ten jurors nonetheless agreed the defendant was not negligent either. The defendant was awarded judgment on the basis of the special verdict returned by the jury, and the plaintiff perfected a timely appeal to this court.

## II.

The plaintiff argues a host of errors committed by the trial judge before and in the course of trial prevented the jury from reaching a just verdict. We begin our review of the proceedings in the trial court by examining the claim of error relating to pre-trial discovery.

## A.

Shortly after filing the complaint for damages, plaintiff's counsel served the defendant with a Request for Production of Documents pursuant to Rule 34 of the Hawaii Rules of Civil Procedure (HRCP). Among the documents sought thereby were all those "containing (or referring to) statements (whether verbatim or paraphrased) made by parties, agents of parties, experts or witnesses, pertaining to the . . . occurrence." The request, however, did not result in the transmission of a particular statement sought by the plaintiff, that given thirteen days after the occurrence in question by the defendant to a representative of her insurer. Claiming it was protected by "the attorney/client and attorney/work product privilege," defendant's counsel refused to transmit the statement. Plaintiff's attorney moved thereafter for an order compelling its production.

The trial court ruled instead that the "statements made by Defendant Helen M. Izawa to her insurance company are privileged under Rule 503 of the Hawaii Rules of Evidence." The evidentiary rule cited by the court in denying plaintiff's request grants a lawyer's client "a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." Hawaii Rules of Evidence (Haw. R. Evid.) 503.[2] We are convinced from a review of the circumstances surrounding the defendant's claim of privilege that the court erred by not compelling discovery.

### B.

The provisions pertaining to discovery in the Hawaii Rules of Civil Procedure were adopted "to put an end to the 'sporting theory of justice,' by which the result depends on the fortuitous availability of

---

[2]Haw. R Evid. 503 in relevant part reads:
Lawyer-client privilege    (a) Definitions    As used in this rule
(1) A "client" is a person, public officer. or corporation. association. or other organization or entity, either public or private. who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him
(2) A "representative of the client" is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client.
(3) A "lawyer" is a person authorized. or reasonably believed by the client to be authorized, to practice law in any state or nation.
(4) A "representative of the lawyer" is one directed by the lawyer to assist in the rendition of professional legal services.
(5) A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure would be in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication
(b) General rule of privilege.    A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative. or (2) between his lawyer and the lawyer's representative, or (3) by him or his representative or his lawyer or a representative of his lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest. or (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

attorney-client privilege as a matter of law.

To be sure, courts in other jurisdictions have so held. The Supreme Court of Missouri, for one, "conclude[d] . . . public policy dictates that the statement given by [an insured] to her insurance carrier was clothed with the attorney-client privilege while in control of the insurer." *State ex rel. Caine v. Barker,* 540 S.W.2d 50, 55 (Mo. 1976). The court adopted the reasoning of the Illinois Supreme Court "that the insured may properly assume . . . the communication [was] made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured[,]" since "by the terms of the common liability insurance contract, the insured effectively delegates to the insurer the selection of an attorney and the conduct of the defense of any civil litigation." *People v. Ryan,* 30 Ill 2d 456, 459, 197 N.E.2d 15, 17 (1964). The Supreme Court of Colorado also followed this reasoning in holding "the insurance investigator who took the [insured's] statement was, in effect, an agent of the attorneys for the purpose of acquiring and transmitting . . information to them " *Bellman v. District Court,* 187 Colo 350, 353, 531 P.2d 632, 634 (1975).

Yet we "have serious doubts about the advisability of making . statements taken by an insurance [investigator or] adjuster immune from discovery" as a matter of policy. *State ex rel. Caine v Barker,* 540 S.W.2d at 58 (Seiler, C.J., dissenting).[6] For "the internal documents of

---

The application of *Bellman,* however, was subsequently limited to situations in which an attorney-client relationship between the insurance company and its attorney existed at the time the documents were created. "To the extent that *Bellman* brought preexisting documents within the scope of the attorney-client privilege," the Colorado Supreme Court held "that the case [was] no longer good law " *Kay Laboratories, Inc. v District Court,* Colo , n 3, 653 P.2d 721 723 n.3 (1982)

[6]Chief Justice Seiler expressed his misgivings in these terms:

I have serious doubts about the advisability of making any statements taken by an insurance adjuster immune from discovery. Automobile liability insurance companies and insurance companies in general are in the business of insuring persons, firms, and corporations against loss and liability from a variety of sources. Investigation of claims of all sorts is a matter of routine by insurance companies. It is done when a claim is reported, regardless of whether there is a probability of litigation. Further, it is well known that only a small fraction of claims involve litigation. The vast majority are settled without litigation and without lawyers. When an insurance adjuster takes a statement from an insured for an insurance company, he is doing no more than performing the routine business of the insurance company. Instead of liberalizing discovery by the adoption of our new rule 56 in 1975 (which I believe is what the court

insurance companies obtained in the normal course of business relating to the claims of their insureds" would then be shielded from discovery, and we would be creating a new privilege (insured-insurer) or extending a statutory privilege beyond its intended reach. *Id.* at 58-59.

Like the Supreme Court of Wisconsin, we think "it is not wholly correct to say that a communication from insured to insurer is the same as a communication of client to attorney." *Jacobi v. Podevels,* 23 Wis. 2d 152, 156, 127 N.W.2d 73, 76 (1964).[7] "The insurance carrier is more than a mere agent transmitting the policyholder's statement to the attorney hired to defend the insured." *Butler v. Doyle,* 112 Ariz. 522, 525, 544 P.2d 204, 207 (1975). Unlike an attorney, it may use the policy-holder's statement for purposes inimical to his interests:

> The insurance carrier has the right to review and consider the statement submitted by the insured for any legitimate purpose connected with the business of the company. Coverage, cooperation, and renewal are a few of the matters, in addition to consideration of the potential claim. for which the insurer may use the statement of the insured. The use of the statement for a purpose adverse to the interest of the insured is certainly inconsistent with the claim of privilege upon his behalf.

*Butler v. Doyle,* 112 Ariz. at 525, 544 P.2d at 207; *see also supra* note 6.

We therefore perceive no basis for affirming the trial court's summary extension of the attorney-client privilege. The privilege exists because we recognize "the value of legal advice and assistance based upon full information of the facts and the corollary that full disclosure to counsel will often be unlikely if there is fear that others will be able to compel a breach of the confidence." *Jacobi v. Podevels,* 23 Wis. 2d at

---

intended to do) the rule announced by the principal opinion would shield from discovery the internal documents of insurance companies obtained in the normal routine of their business relating to the claims of their insureds.
*State ex rel. Caine v. Barker,* 540 S.W.2d at 58 (footnote omitted).

[7]The court's belief was premised on these observations:
When the insured makes such a statement he is ordinarily fulfilling a condition of his policy, requiring him to notify the insurer of the occurrence and circumstances of the accident and to cooperate with the insurer. If the statement be false, the insurer may use it against the insured as foundation for a claim of noncooperation. If the statement discloses facts giving rise to some other defense against the insurer's liability under the policy, the insurer is doubtless free to make use of those facts.
*Jacobi v. Podevels,* 23 Wis. 2d at 156, 127 N.W.2d at 76.

 

156, 27 N.W.2d at 76. "It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest limits consistent with the logic of its principle." VIII *Wigmore on Evidence, supra,* at 554.

The trial court's failure to confine the privilege within these limits was error, and we cannot say it was harmless. Given the widely divergent testimony offered by the parties about the occurrence, the suppressed statement, if disclosed to the plaintiff, might have influenced the outcome of the trial.[8]

### III.

Proceeding to the plaintiff's claims of trial error, we consider the jury instruction covering the "emergency situation" purportedly confronted by the defendant as she drove toward Kailua on the fateful day. The instruction, the plaintiff argues, was misleading and responsible in part for the jury's unjust verdict.

### A.

We begin our analysis by turning to HRCP 49(a), which governs when a jury is asked "to return . . . a special verdict in the form of a special written finding upon each issue of fact." This procedural rule mandates that the court provide "such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." HRCP 49(a). Hence, the trial court's instructions should "explain the law of the case, . . . point out the essentials to be proved on one side or the other, and bring into view the relation of the particular evidence adduced to the particular issues involved." *McKeague v. Talbert,* 3 Haw. App. 646, 657, 658 P.2d 898, 906 (1983) (citation omitted) (quoted with approval in *Kaeo v. Davis,* 68 Haw. 454, 465, 719 P.2d 387, 394 (1986)).

A basic issue in the case now before us, of course, is whether the defendant was negligent in the circumstances, and it was essential that

---

[8]Our conclusion that the communication here was not privileged, however, does not carry a suggestion that all statements made by an insured to his insurance carrier are not within the attorney-client privilege.

the trial court explain the standard of conduct to which the defendant must have conformed to avoid being negligent. *Restatement of Torts (Second)* § 283.[9] Thus, the jury was given an instruction that read:

Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under the circumstances shown by the evidence. It is the failure to use ordinary care.

Ordinary care is that care which persons of ordinary prudence would, under the circumstances shown by the evidence, exercise in the management of their own affairs in order to avoid injury or damage to themselves or their property, or to the persons or property of others.

Ordinary care is not an absolute term, but a relative one. That is to say, in deciding whether ordinary care was exercised in a given case, the conduct in question must be considered in the light of all the surrounding circumstances, as shown by the evidence.

The instruction defined "negligence" and "ordinary care"; it explained that "in deciding whether ordinary care was exercised . . , the conduct in question must be considered in the light of all the surrounding circumstances, as shown by the evidence." In our view the instruction correctly laid down the "standard of conduct" or care expected of a person "for the protection of others against unreasonable risks." W. Prosser and W. Keeton, *The Law of Torts* § 30, at 164 (5th ed. 1984).

The trial court, however, provided the jury with another discrete instruction on the relevant standard of care,[10] reading:

An emergency situation is a sudden or unexpected combination of circumstances which calls for immediate action. Such a situation leaves the actor with no time for thought and requires a speedy decision based largely upon impulse.

---

[9] *Restatement of Torts (Second)* § 283 reads:
Conduct of a Reasonable Man:   The Standard
Unless the actor is a child, the standard of conduct to which he must conform to avoid being negligent is that of a reasonable man under like circumstances.

[10] The instruction defining "negligence" and "ordinary care" is recorded on page 18 of the transcript of proceedings conducted in the trial court on April 30, 1985. The "sudden emergency" instruction is recorded on page 21; it was given after the instruction on the plaintiff's duty to mitigate damages and before the instruction advising the jury that counsel's calculation of damages was not evidence.

Thus, if you find that if Defendant HELEN M. IZAWA faced an emergency situation on April 12, 1982 which was not of her making, you must find that she was not negligent in her conduct if you also find that her actions were those of a reasonably prudent person in a similar emergency. Whether or not such emergency situation existed on April 12, 1982 is a matter of fact for you to decide based upon all of the evidence in this case.

Though one "confronted with an emergency [ought not] be held to the standard of conduct normally applied to one who is in no such situation," Prosser and Keeton, *supra* § 33, at 196, we nonetheless think the instruction should not have been given.

### B.

Courts applying the "sudden emergency" rule or doctrine spell out "emergency" as "a sudden or unexpected event or combination of circumstances which calls for immediate action." *Id.* (footnote omitted). The rationale for the rule is that "the actor is left no time for adequate thought, or is reasonably so disturbed or excited that [he] cannot weigh alternative courses of action, and must make a speedy decision based very largely upon impulse or guess." *Id.* (footnote omitted). When these conditions prevail, "the actor cannot reasonably be held to the same accuracy of judgment or conduct as one who has had full opportunity to reflect." *Id.*

But the appearance of an emergency "does not invoke a different standard of care than that applied in any other negligence case." *Martin v. City of New Orleans*, 678 F.2d 1321, 1325 (5th Cir. 1982). "The conduct required is still that of a reasonable person under the circumstances, as they would appear to one who was using proper care, and the emergency is to be considered only as one of the circumstances." Prosser and Keeton, *supra*, at 196-97 (footnote omitted). In other words, "[t]he doctrine of sudden emergency cannot be regarded as something apart from and unrelated to the fundamental rule that everyone is under a duty to exercise ordinary care under the circumstances to avoid injury to others. A claim of emergency is but a denial of negligence." *Lawrence v. Deemy*, 204 Kan. 299, 306, 461 P.2d 770, 774 (1969); *see also Restatement of Torts (Second)* § 296. Moreover, an emergency of his own making obviously does not shield the negligent person from liability. Prosser and Keeton, *supra*, at 197 (footnote omitted). And when one

"engages in an activity in which [emergencies] are likely to arise," he "must be prepared to meet them." *Id.*[11]

Appellate courts "have been greatly plagued by instructions given and refused on the . . . sudden emergency and kindred negative defenses[,]" and "[a]lmost every volume of current appellate court reports reflects the struggle [they] are having with these negative aspects of the negligence issue[.]" Green, *The Submission of Issues in Negligence Cases,* 18 U. Miami·L. Rev. 30, 43 n.42 (1963). And, "[d]espite the basic logic and simplicity of the sudden emergency doctrine, it is all too frequently misapplied on the facts or misstated in jury instructions." Prosser and Keeton, *supra,* at 197 (footnote omitted).

Here, it is arguable that the doctrine was misapplied on the facts; it is problematic whether one driving on a busy highway who "panics" and abandons control of her vehicle when another vehicle cuts into her lane of traffic can rely on sudden emergency as a defense. Yet we have advised our trial courts that "[i]f any policy [on instructing juries] is to be preferred, it is that of allowing adequate and thorough instructions to be given." *Barretto v. Akau,* 51 Haw. 383, 399, 463 P.2d 917, 926 (1969). Therefore, we are disinclined to go so far as to say the trial court abused its discretion by giving an instruction on "sudden emergency." But when it decided to give one, the trial court was obliged to explain the law so the jury would not be misled or confused.

The trial court properly instructed the jury on the basic issue of negligence and the standard of conduct to which the defendant must have conformed to avoid being negligent. But in the course of instructing the jury on another issue, the court expounded the negative defense raised by the defendant and gave an additional instruction on the applicable standard of care. *See supra* note 10. The existence of "a sudden or unexpected combination of circumstances [calling] for imme-

---

[11]The quoted language is from a paragraph of the treatise reading:

A further qualification which must be made is that some "emergencies" must be anticipated, and the actor must be prepared to meet them when he engages in an activity in which they are likely to arise. Thus, under present day traffic conditions, any driver of an automobile must be prepared for the sudden appearance of obstacles and persons in the highway, and of other vehicles at intersections, just as one who sees a child on the curb may be required to anticipate its sudden dash into the street, and his failure to act properly when they appear may be found to amount to negligence.

Prosser and Keeton, *supra,* at 197 (footnotes omitted).

diate action," however, is related to the "environmental details incident to the 'circumstances surrounding' the defendant's conduct." Green, *supra,* at 42. Any instruction on the purported emergency, therefore, should have been "included in the explanatory instruction given in connection with [the] clause of the basic negligence instruction" advising the jury that the conduct in question must be considered in the light of all the surrounding circumstances. *Id.* at 42-43.

We do not think the "close and subordinate connection of [the] negative defense[] to the basic negligence issue [was] made clear." *Id.* at 43. Guidance on the "emergency situation" was offered in a separate instruction given in the midst of admonitions related to damages. This might have fostered an impression that the "sudden or unexpected combination of circumstances" calling for "a speedy decision based largely upon impulse" presented an issue unconnected to the basic negligence issue. Given as it was, the instruction could easily have caused the jury to believe an emergency situation invokes a standard of care different from that required in other situations. At the least, it focused undue attention on the subordinate issue and could only have been confusing. "Repetitious instructions [should] be avoided"; trial courts in our opinion should strive "to reduce the number of instructions" and "give a fair and complete single instruction on each issue." *Tittle v. Hurlbutt,* 53 Haw. 526, 531, 497 P.2d 1354, 1363 (1972). What the court did here was unfair to the plaintiff, as well as confusing to the jury; it was an abuse of discretion amounting to error.

## C.

Other appellate courts have learned as we have that an instruction expounding the sudden emergency doctrine has a "tendency to elevate its principles above what is required to be proven in a negligence action." *Knapp v. Stanford,* 392 So. 2d 196 (Miss. 1980). For "[e]ven the wording of a well-drawn instruction intimates that ordinary rules of negligence do not apply to the circumstances constituting the claimed 'sudden emergency.'" *Id.* at 198. So, the Supreme Court of Mississippi decided "the orderly disposal of negligence cases would be best served by applying uniform principles of negligence under all circumstances." *Id.* at 199. The Montana Supreme Court likewise concluded "the ordinary rules of negligence . . . afford a sufficient gauge by which to appraise conduct." *Estinger v. Ringsby Truck Line, Inc.,* 195 Mont. 292, 302, 636 P.2d 254,

260 (1981). And Montana now follows "the rule that a jury instruction on . . . sudden emergency has no place in an ordinary automobile accident case." *Ewing v. Esterholt,* 684 P.2d 1053, 1059 (Mont. 1984). Furthermore, "the model jury instructions in at least Illinois, Florida, Kansas and Missouri recommend that no such instructions be given . . . ." Prosser and Keeton, *supra,* at 197.

As the Oregon Supreme Court has observed, "it would be a rare situation[] indeed[] where it would be error to fail to give [such instruction] because the usual instruction on negligence sufficiently covers what a reasonably prudent person would do under all circumstances, including those of sudden emergency. Kiddle v. Schnitzer et al., 167 Or. 316, 114 P.2d 109, 117 P.2d 983 (1941)." *Evans v. General Telephone Co. of the Northwest, Inc.,* 257 Or. 460, 465, 479 P.2d 747, 750-51 (1971). On the other hand, "the sudden emergency doctrine . . . is all too frequently misapplied on the facts or misstated in jury instructions." Prosser and Keeton, *supra,* at 197. Inasmuch as the risk of prejudicial error in instructing the jury on the doctrine exceeds by far the possibility of error in not doing so, we think the wiser course of action would be to withhold sudden emergency instructions. It would be foolhardy to jeopardize the outcome of trial by giving an instruction adding little to the basic jury charge that must be given in any negligence action.

Our conclusions in this regard are by no means meant to foreclose argument to the jury that "a sudden or unexpected event or combination of circumstances [calling] for immediate action" left the actor with "no time for adequate thought" and he could not "reasonably be held to the same accuracy of judgment or conduct as one who . . . had full opportunity to reflect." Prosser and Keeton, *supra* § 33, at 196. Circumstances purportedly constituting an emergency are properly matters for argument by counsel. *See, e.g.,* Committee on Pattern Jury Instructions Kansas District Judges' Association, Pattern Instructions for Kansas 8.81 (Supp. 1975). For the conduct in question must always be considered in the light of all the surrounding circumstances.

IV.

Our rulings on the first two points of error raised by the plaintiff render a discussion of her remaining claims of trial error, as well as the claim of error raised by the defendant in her cross-appeal, unnecessary.

The judgment of the circuit court is vacated, and the case is

remanded for a new trial.

*Michael D. Wilson* (*Peter C. Wolff, Jr.*, with him on the briefs; *Hart, Wolff & Wilson*, of counsel) for appellant.

*Kathy K. Higham* (*David A. Nakashima* with her on the briefs; *Rush, Moore, Craven, Kim & Stricklin*, of counsel) for appellee.